ESTATE OF EDGAR A. BERG, DECEASED, GEORGE UNRUH, JR. AND ELAINE UNRUH, CO-PERSONAL REPRESENTATIVES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Berg v. Commissioner
Docket No. 17666-89
United States Tax Court
T.C. Memo 1991-279; 1991 Tax Ct. Memo LEXIS 322; 61 T.C.M. (CCH) 2949; T.C.M. (RIA) 91279; June 20, 1991, Filed *322 Decision will be entered for the respondent. Robert Vaaler, for the petitioner. Ellen T. Friberg, for the respondent. WRIGHT, Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $ 127,608 and an addition to tax under section 6660[1] in the amount of $ 12,761. The issues for decision are: (1) The appropriate discounts for minority interest and lack of marketability to be applied to petitioner's shares of stock in Vaberg Properties, Inc., a closely held real estate holding company; (2) whether, due to the underpayment attributable to underevaluation of petitioner's shares in Vaberg Properties, Inc., petitioner is liable for an addition to tax under section 6660. FINDINGS OF FACT *323 Some of the facts have been stipulated and are found accordingly. The stipulation and the accompanying exhibits are incorporated herein. Edgar A. Berg (the decedent), a resident of Grand Forks, North Dakota, died on June 6, 1985. When he died, the decedent owned 2,692 shares of stock in Vaberg Properties, Inc. (Vaberg). George M. Unruh, Jr. (Unruh), the decedent's grandson and the president of Vaberg, is the co-personal representative of the estate. Vaberg is a North Dakota real estate holding company which, on June 6, 1985, owned, operated, and managed commercial and undeveloped real estate in and around Grand Forks, North Dakota. Vaberg was incorporated as the result of a reorganization of Vaberg, Inc., Extraman Corporation, Dakota Properties (a partnership), and Sunny Nodak Farms (a partnership). The business operations of Vaberg began on January 1, 1985. There have been no sales of stock of Vaberg to the public or privately. On June 6, 1985, the ownership of stock in Vaberg was: Name
Relationship
Shares
% of Ownership
Edgar A. Berg
Decedent
2,692
26.92
George Unruh, Jr.
Grandson
3,399
33.99
V. Paul Unruh
Grandson
3,399
33.99
Elaine Unruh
Daughter
97
.97
George Unruh, Sr.
Son-In-Law
342
3.42
Unruh Trust
Family Trust
70
.70
John Shaft
Vaberg's Attorney
1
.01
Total
10,000
100.00
*324 As of the valuation date, Vaberg was operated by the following persons: Name
Title
1.  Edgar A. Berg (decedent)
Director
2.  George M. Unruh, Jr.
Director
3.  John G. Shaft
Director
When it commenced operations, and on the date of decedent's death, Vaberg owned the following properties: (1) Louise Apartments; (2) Dana Apartments; (3) Gateway Manor; (4) Stanford Arms; (5) Red River Terrace; (6) Hatton Apartments; (7) Vaberg Office Building; (8) Truck Garage Building; (9) Sunny Nodak Farms (undeveloped land); (10) North Star Inn; and (11) furniture and fixtures. These properties were of high quality, well maintained, and in stable neighborhoods. In order for Vaberg to obtain financing, Raymond R. Reilly (Reilly), a highly qualified local appraiser, appraised several of the properties owned by Vaberg's predecessors in interest as of March 28, 1984. Reilly has taken courses in theories and principles of appraisal, real estate appraisal problems, appraisal of single family residences, equity capitalization, appraisal of rural properties, real estate investment analysis, and principles of income property appraisals. He is a member of the American Institute of Real Estate *325 Appraisers (M.A.I.), the Society of Real Estate Appraisers, the National Association of Review Appraisers, and the Society of Farm Managers and Appraisers. The values of the Vaberg properties as appraised by Reilly were: Property
Value
(1)  Louise Apartments
$   350,000
(2)  Dana Apartments
260,000
(3)  Gateway Manor
680,000
(4)  Stanford Arms
1,050,000
(5)  Vaberg Office Building
123,000
(6)  North Star Inn
1,100,000
Reilly used three methods to value the real estate. Reilly initially used the Cost Approach, which is based on the proposition that an informed purchaser would pay no more than the cost of constructing a substitute property with the same utility as the subject properties. The indication of value derived from this approach is reached by estimating the value of land and adding the reproduction cost of the improvement, less accrued depreciation. Land value is estimated by comparing actual market sales of other similar sites to the subject site. Each sale is adjusted for differences in location, size, topography, and other variables. The cost of improvements is estimated through a reliable cost service. Among the adjustments made to the Cost *326 Approach are economic influences outside of the property itself. The estimation of accrued depreciation is the most difficult part of this approach, particularly when the improvements have passed middle age. The value indicated by the Cost Approach tends to be more reliable on newer properties. Reilly next considered the Income Approach, which converts anticipated benefits (typically rents) to be derived from the ownership of property into a value estimate. The past is relevant only to the extent that it furnishes a basis for future expectations. Real estate value, consequently, is the present worth of the benefits of ownership as anticipated by the people who constitute the market. The basic steps used in analyzing a property by the income approach are: 1. Estimate the potential gross income. 2. Estimate and deduct a vacancy and collection loss allowance to derive effective gross income. 3. Estimate and deduct expenses of operation to derive net operating income (net income before recapture). 4. Estimate remaining economic life or the duration and pattern of the projected income stream. 5. Select an appropriate capitalization method or technique. 6. Develop *327 the appropriate rates. 7. Complete the necessary computations to arrive at an indication of value. The principal weakness of the Income Approach is that the value estimate can be easily distorted by the use of inappropriate or incorrect income figures, expense figures, and capitalization rates. Finally, Reilly considered the Direct Sales Comparison Approach, also known as the Market Data Approach, which is based on the proposition that an informed purchaser will pay no more for a property than the cost to him of acquiring an existing property with the same utility. The steps used in determining property value through this method are: 1. Research the available market to assemble sales of land comparable to the subject property. 2. Properly qualify the comparable sales as to the conditions and terms of sale. 3. Analyze the sales and properly abstract common units of comparison. 4. Consider the dissimilarities and adjust each sale accordingly to derive individual market indications for the subject property. Four adjustment factors are typically recognized: (a) time, (b) location, (c) conditions of sale, and (d) physical characteristics. Recent sales best reflect *328 the current economic conditions. 5. From the pattern developed, formulate an opinion of value for the subject property. If a sufficient number of similar sales are available, as in the instant case, and properly analyzed, the resulting pattern provides a good indication of market value. The final step in the appraisal process is the reconciliation or correlation of the values as indicated by the three approaches to value. In appraising the subject properties, Reilly assembled a great deal of current market data. He concludes that the Market Data Approach is entitled to most consideration because it most accurately reflects the market for the subject properties. However, Reilly did give some weight to the Cost Approach and Income Approach. The parties agree that as of June 6, 1985, the fair market values of the properties held by Vaberg were: (1)  Louise Apartments
$   378,000
(2)  Dana Apartments
280,000
(3)  Gateway Manor
735,000
(4)  Stanford Arms
1,134,000
(5)  Red River Terrace
993,000
(6)  Hatton Apartments
352,000
(7)  Vaberg Office Building
162,000
(8)  Truck Garage Building
145,940
(9)  Sunny Nodak Farms
449,213
(10) North Star Inn
1,414,830
(11) furniture and fixtures
10,000
Total
$ 6,053,983
*329 These values are based on the values determined by Reilly as of March 28, 1984, increased by the value of subsequent improvements to the properties. The basis for the valuation of the properties not appraised by Reilly (Hatton Apartments, Truck Garage Building, Sunny Nodak Farms, and furniture and fixtures) is unknown. The parties agree that the fair market value of all of the stock of Vaberg as of the date of decedent's death is $ 4,020,000, the net asset value of the corporate properties. The net asset value was calculated by taking the gross value of $ 6,054,153, less the outstanding debt of $ 2,034,153. The parties agree that the fair market value of the decedent's stock in Vaberg as of the date of his death, prior to application of minority or lack of marketability discounts, is 26.92 percent of $ 4,020,000, or $ 1,082,184. Petitioner's Federal estate tax return (Form 706) was prepared by Wilhelmine A. Ulven, a certified public accountant. On March 6, 1986, petitioner requested, and was granted, a 3-month extension of time to file. The extension was requested "in order to accurately determine the value of shares of a closely held corporation and the minority discount *330 that is appropriate." C. J. Whalen, Unruh's accountant, determined the value of decedent's stock in Vaberg which was reported on the estate tax return. Whalen determined the discounted value of decedent's 2,692 shares of stock to be $ 384,293 as of June 6, 1985. Petitioner did not attach an appraisal of Vaberg's assets, or of decedent's stock in Vaberg, to the estate tax return. No appraisals of decedent's stock in Vaberg were commissioned for more than 4 years after his death. Petitioner's entire explanation for the valuation of decedent's interest in Vaberg, as expressed on the estate tax return, consists of the following: The market value of these shares represents a 26.92 percent interest in the corporation and is based upon the net asset value of the corporation. The major part (over 90 percent) of the corporation's net assets consists of apartment, office, garage and motel types of properties. Of the total value of all properties ($ 6,054,153), over 70 percent ($ 4,294,000) of the properties were appraised by qualified appraisers within 15 months of the date of death. The appraisers considered the cost approach, the income approach, and the market approach in the development *331 of their valuations. The asset values used were in excess of the appraised values (primarily to reflect property additions after the appraisal date) as well as in excess of the real estate valuations made by the Grand Forks assessor for real estate taxes. The market value used for the fractional interest is 40 percent of the net asset value. This percentage is the result of applying a discount both because the stock represents a minority interest and because the stock interest has a very limited marketability. The facts affecting this valuation are similar to those that existed in the case of Estate of Woodbury G. Andrews, 79 T.C. 938 and that Court's conclusion is relied upon in this situation.
Thus, petitioner applied a discount of 60 percent to decedent's Vaberg stock because the stock represents a minority interest and because the stock interest has a limited marketability. In his notice of deficiency, respondent determined that petitioner incorrectly determined the discounted value of decedent's 2,692 shares of Vaberg stock. Respondent determined that the undiscounted value of decedent's shares of Vaberg should be discounted 20 percent because *332 it is a minority interest, and 10 percent for lack of marketability, for a total discount of 30 percent. Thus, respondent determined that decedent's 2,692 shares of Vaberg stock had a discounted fair market value of $ 757,528.80 on June 6, 1985. Respondent also determined that petitioner was liable for the addition to tax under section 6660 for a valuation understatement as to the value of the decedent's Vaberg stock. OPINION Property includable in a decedent's estate is includable at its fair market value as of the date of death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. Sec. 20.2031-1(b), Estate Tax Regs. In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition *333 to all other factors, the value of stock and securities of corporations engaged in the same or a similar line of business which are listed on an exchange. Sec. 2031(b). The valuation of stock in a closely held corporation, including the appropriate discounts to apply, must take into account all relevant facts and circumstances of the particular corporation at issue. Northern Trust Co. v. Commissioner, 87 T.C. 349, 384 (1986); sec. 20.2031-2(f), Estate Tax Regs. The courts have long recognized that the shares of stock of a corporation which represent a minority interest are usually worth less than a proportionate share of the value of the assets of the corporation. Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981) (en banc); Ward v. Commissioner, 87 T.C. 78, 106 (1986); Harwood v. Commissioner, 82 T.C. 239 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Andrews v. Commissioner, 79 T.C. 938 (1982); Estate of Zaiger v. Commissioner, 64 T.C. 927 (1975); Estate of de Guebriant v. Commissioner, 14 T.C. 611 (1950), *334 revd. on other grounds sub nom. Claflin v. Commissioner, 186 F.2d 307 (2d Cir. 1951). The minority discount is recognized because the holder of a minority interest lacks control over corporate policy, cannot direct the payment of dividends, and cannot compel a liquidation of corporate assets. See Harwood v. Commissioner, supra at 267; Estate of Andrews v. Commissioner, supra at 953. A lack of marketability discount, on the other hand, reflects the fact that there is no ready market for shares in a closely held corporation. Ward v. Commissioner, supra; Estate of Andrews v. Commissioner, supra at 953. The burden is on petitioner to establish the appropriate discounts in the instant case. Rule 142(a); Ward v. Commissioner, supra at 107. I. Petitioner's Reliance On Estate of Andrews v. Commissioner
Petitioner relies heavily on Estate of Andrews v. Commissioner, supra, to support its position that the appropriate minority discount and discount for lack of marketability to be applied to decedent's interest in *335 Vaberg are 40 percent and 20 percent, respectively. Estate of Andrews involved ownership by a decedent of approximately 20 percent of four closely held corporations. All four corporations were involved primarily in the ownership, operation, and management of commercial real estate. The real estate holdings included warehouses, apartment buildings, factories, offices, and retail stores. Estate of Andrews v. Commissioner, supra at 939. Many of the properties were in rundown urban areas, and most of the buildings were quite old. Most of the properties were leased to small tenants under leases for periods of less than 5 years. In Estate of Andrews we determined the undiscounted value of the decedent's stock in the four corporations after considering the expert reports, the extremely conservative business attitudes and practices of the management, the nature of the real estate holdings, the amount of cash and other liquid assets held by the corporations, and the business climate on the valuation date, both overall and for the corporations at issue. We then discounted the value of the stock for lack of marketability and for lack of control. The discounts *336 were based on the lack of control that could be exercised by a hypothetical buyer of the stock on the valuation date, and that hypothetical buyer's inability to sell the shares in the marketplace. Estate of Andrews v. Commissioner, supra at 953, 957. We found that the appropriate combined discount for lack of control and lack of marketability was 60 percent. Our discussion of minority interest and lack of marketability discounts in Estate of Andrews centers around the question of whether family attribution applies in determining the value of the shares and whether the asset value or dividend paying capacity was the proper valuation method to use. Neither question is at issue in the instant case. Respondent does not argue in this case that a minority interest discount and lack of marketability discount are inapplicable because of the family relationship between the shareholders of Vaberg, nor does respondent argue that any weight should be given to the earning or dividend paying capacity of the company. The controversy in the instant case, unlike that in Estate of Andrews, centers on the amount of the lack of marketability and minority discounts *337 to be applied. In its post-trial brief petitioner cites several other court decisions in support of its position: Northern Trust Co. v. Commissioner, supra; Harwood v. Commissioner, supra; Martin v. Commissioner, T.C. Memo 1985-424; Estate of Little v. Commissioner, T.C. Memo 1982-26; Whittemore v. Fitzpatrick, 127 F. Supp. 710 (D. Conn. 1954). We will not discuss these cases in any detail for two reasons. First, the facts of each case are distinguishable from those of the instant case. Second, the valuation of the appropriate discounts must take into account all relevant facts and circumstances of the particular corporation at issue. Northern Trust Co. v. Commissioner, supra.This and other courts have decided many cases involving discounts. The fact that petitioner found several cases which approve discounts approximately equal to those claimed in the instant case is irrelevant. Therefore, in deciding the appropriate discounts in the instant case we will take into account all relevant facts and circumstances of petitioner's interest in Vaberg, *338 and do not consider the amount of discount applied in other cases cited by petitioner as persuasive. II. Petitioner's Expert Appraisers
Appraisal By C. J. Whalen, C.P.A.
C. J. Whalen is an experienced certified public accountant who has served on the faculty of several universities. He has also served as an expert witness in several cases that involved the determination of the effect of minority interest discount and lack of marketability discount. However, Whalen has no formal education as an appraiser. Whalen determined that a minority interest discount of 40 percent was appropriate because a 26.92-percent minority interest has no voice in corporate affairs, and cannot compel any return on investment. Further, he reasoned that there is no assurance that the value of the interest will ever be recovered on a timely basis. In addition, Whalen relied on Estate of Andrews v. Commissioner, supra, finding that because of the similar factual circumstances of Estate of Andrews and the instant case, he considered Estate of Andrews a compelling item of precedent. Finally, he considered two articles published in Estate Planning in 1975 and *339 1983 by H. Calvin Coolidge, head of the family business division of the trust department of an unidentified bank in Chicago. In his articles, Coolidge gathered actual evidence based upon his personal knowledge of sales information relating to transactions handled through the bank. During the period covered by his studies (1961-83), he examined 100 transactions. Coolidge stated that the percentage of minority interest discount increased during the term of his studies, with 47 percent of the examined sales made at discounts of 40 percent or more. The average minority interest discount for all sales was 39.9 percent. Whalen found that a lack of marketability discount was also proper because there is no ready market for the stock interest held by petitioner. In addition, normal purchase incentives did not exist. That is, a prospective buyer could have no basis to expect any dividend yield nor were there real growth prospects for the corporation. Finally, there was no indication that the other shareholders or any other person had any plans or need to ever acquire petitioner's interest. Once again, Whalen relied on Estate of Andrews v. Commissioner, supra, *340 to provide support for the lack of marketability discount because the combined discounts in that case were 64.75 percent, and it was Whalen's conclusion that the minority discount was 40 percent. Whalen concluded that the discount for lack of marketability for the shares owned by petitioner should be 20 percent. In addition, Whalen relied on five studies regarding restricted stock which indicate that the average lack of marketability discount has been between 32.6 percent and 45 percent from 1966 through 1982. These studies were based upon a variety of enterprises. Whalen also considered it significant that the minority interest held by the estate had no alternative to a substantial discount in the market place because it could not recover its investment by forcing a liquidation, partitioning any of the properties, or forcing a sale of any of the properties. Whalen testified at trial that, in addition to the methods discussed in his appraisal report, he relied on an additional method in arriving at a total discount of 60 percent. He determined that the U.S. Government bond rate for long-term Government bond investments was between 10 and 11 percent in 1985. He then reasoned, *341 using a present value table and a 10 percent rate of return for 10 years, that the present value of an investment in the decedent's Vaberg stock was 40 percent of its undiscounted value as of the date of death. Whalen reasoned that the appropriate total discount for minority interest and lack of marketability is therefore 60 percent of its asset value. Appraisal By Arthur H. Cobb
Arthur H. Cobb (Cobb) is president of Cobb, Ludington and Associates, Ltd., a firm practicing capital finance and litigation support. Cobb is an experienced certified public account who has served as a professor at a university. Cobb has no formal training as an appraiser, but has provided advisory services related to valuation of equity interest, mergers, acquisitions, leveraged buyouts, employee stock ownership plans, and litigation. Cobb concluded that a minority interest discount is appropriate because the 26.92 percent in Vaberg owned by petitioner is without control due to the existence of two blocks of 33.99 percent. A minority interest, Cobb reasoned, cannot independently elect the board of directors, direct management of the company, force the sale or liquidation of the company's assets, *342 cause distribution of the company's assets, or cause distribution of dividends. Cobb's analysis of the appropriate minority interest discount consists in its entirety of the follow paragraph: The average premium paid over market price for companies engaged in the real estate industry was 41.6 percent in 1985 (according to a study of publicly announced formal transfers of ownership of at least 10 percent of a company's assets or equities, where the purchase price was at least $ 500,000). This study indicated that the all industry average premium paid over market prices as 37.1 percent in 1985.
Based on this analysis, Cobb concludes that the appropriate discount for a minority interest in the instant case is 30 percent. Cobb does not identify the study on which he relies. Cobb finds that a lack of marketability discount is appropriate because there has been no ready market for equity interests in Vaberg, and any equity investment in Vaberg is an illiquid investment. Cobb reasons that an investment in Vaberg would constitute an assumption of substantial risk because its holdings are not diverse in geographic location. All of its holdings are located in or near Grand *343 Forks, North Dakota, and are of limited diversion in operation and quality. Cobb then analyzes changes in the population of Grand Forks, North Dakota, and Polk County, Minnesota, from 1980 through 1985. He states that nationally, the market for interests in real property was constrained in 1985 due to uncertainties created by the proposal of changes in taxation in real estate investments. Uncertainty regarding changes, Cobb reasons, reduced the marketability of real property for investment and of equity interest in real property. Syndicators, he states, which had been especially active in multi-family housing, decreased their activity and reoriented remaining activity toward economic return and away from tax incentives. Cobb's analysis of the appropriate discount for lack of marketability is limited to the following paragraph: Discounts related to marketability customarily range from 10 percent to 90 percent and the midpoint of the range is generally 30 to 40 percent; (according to industry and Security [sic] and Exchange Commission studies.)
Cobb does not identify the industry and Securities and Exchange Commission findings and studies to which he refers. Based on this *344 analysis, Cobb finds that the appropriate discount for lack of marketability is 40 percent. Analysis Of Grand Forks Real Estate Market
Petitioner introduced into evidence an economic analysis of the Grand Forks real estate market from 1975 through 1989. The analysis was prepared by David E. Ramsett, Ph.D., a professor of economics at the University of North Dakota, which is located in Grand Forks. Professor Ramsett is a highly accomplished economist and educator. He prepared a detailed, authoritative, and extensively researched report. Among his findings is that while the Grand Forks economic base is stable, "it has not experienced any significant degree of change in either direction." It is inaccurate, he states, to assert that Grand Forks is "a high growth area which has been experiencing an economic boom." His research indicates that the secondary market for multiple unit real estate has remained very weak. During the 1980-81 period, the average value per foot of multiple family dwellings was more than $ 40; during 1982-83 it declined to less than $ 30; it then began a mild recovery in 1984-86 to $ 33 per square foot. Investor interest in purchasing multiple unit real *345 estate, he reports, has been very weak during the 1980's and so remains. The major market demand in 1990, the date of the report, was for low cost housing. He concludes that the fact that sales of multiple family units have worsened after 1986 is at least partially due to the revisions in the Code by the Tax Reform Act of 1986, which removed most tax benefits for real estate. Because of these factors, Grand Forks real estate has not been attractive since the early 1980's. III. Respondent's Expert Appraisal
Prepared By Scot A. Torkelson, Reviewed And Approved By William C. Herber And Robert J. Strachota
Scot A. Torkelson, William C. Herber, And Robert J. Strachota are all employed by Shenehon & Associates, Inc., which is in the business of real estate and business valuations. Scot A. Torkelson (Torkelson), a professional appraiser, has completed courses sponsored by the American Society of Appraisers in research and analysis of business valuations, advanced valuation, and closely held business valuation. He is an associate member of the American Society of Appraisers, Business Valuation Section. William C. Herber, a professional appraiser, has completed an *346 advanced business valuation seminar, a closely held corporations valuation seminar, four business valuation courses, and a business valuation strategy seminar. He is an associate member of the American Society of Appraisers, Business Valuation Section, and is a member of the Institute of Business Appraisers. Robert J. Strachota, a professional appraiser, has completed courses in eminent domain valuation, going concern valuation, and two courses in valuation of businesses and professional practices. He is a member of the American Institute of Real Estate Appraisers, an associate member in the American Society of Appraisers, Business Enterprise Section, and a member in the Institute of Business Appraisers. Torkelson's appraisal contains the following analysis of the appropriate minority interest discount in the instant case: With respect to the subject investment real estate holding company, we have examined the most similar publicly traded stock available. Real Estate Investment Trusts, or REITs, trade on the public markets at a discount from their actual appraised net real estate value, reflecting the minority interest of the stockholders (public markets reflect minority interest *347 market values). A study performed in December 1984 by Robert P. Oliver, ASA, published in Business Valuation News, June 1986, compared the market price of REIT's as a percentage of net asset value. The market prices reflected minority interest stock transactions at that time. The resulting discount indicated an average 24 percent discount from net asset value to market value. This discount from net asset value arises because investors are acquiring a minority interest position in the respective Real Estate Investment Trusts. We find the subject company's particular investment real estate to be of lessor diversity and quality than the publicly traded REIT's. However, the 26.92 percent ownership position under evaluation is significantly greater than the minority positions which generally occur among the publicly traded REIT's (usually under 5 percent). Additionally, the subject's real estate properties are easily saleable as smaller residential apartment and commercial properties, unlike the publicly traded holdings, which are typically much larger properties and therefore more difficult to sell. Therefore, we have taken a somewhat lower minority discount, which reflects *348 the greater minority position and smaller, more saleable real estate than the publicly traded real estate holding companies.
Torkelson concludes that a 20-percent minority interest discount is appropriate in the instant case. With respect to the discount for lack of marketability, Torkelson first discusses the discount in general terms: A common method of establishing lack of marketability discounts is by looking at publicly traded stock which has had blocks of its stock restricted from open market sales, and comparing the prices of restricted stock with its related unrestricted stock which continues trading in the open markets. The most famous study was conducted in the 1970's by an investment banker Robert E. Moroney, "Most Courts Overvalue Closely Held Securities," published in Taxes-The Tax Magazine, March 1973. The study examined 146 individual blocks of restricted equities. These blocks were discounted from 10 percent to 90 percent from their counterpart unrestricted securities. The average discount was 35 percent. It must be noted that this discount cannot be randomly applied to any investment, due to the fact that all equities from the lowest to the highest *349 risk stocks were utilized in this study, with the only variable being the market applied to the respective stocks.
Because of the variability of the discount for lack of marketability in the Moroney study, Torkelson then discusses the various salient factors effecting the extent of the discount: 1. Extent of Minority Interest -- typically, the smaller the block of privately held shares the greater the discount for lack of marketability. However, in cases where all members hold an equivalent minority position (as is the case with the subject, with three primary owners holding an approximate one-third interest position), the discount tends to be lower due to the fact that control tends to be more shared, as opposed to having one or two members exercising effective control. 2. Quality and Risk Factors of the Real Estate or Equity -- the quality of the business, risk of the enterprise, prospects for growth, quality of earnings, etc. affect the marketability discount. Thus, low risk enterprises tend to trade at much lower discounts than high risk ventures due to the fact that a minority shareholder's capital is much safer in low risk enterprises when they have no *350 control. Similarly, businesses with good prospects for growth and quality earnings offer greater security and therefore marketability to the minority shareholder. In the case of real estate, risk levels are much lower than in intangible business equities, and as a result, lack of marketability discounts are much lower, typically ranging from 5 percent to 20 percent. (Shannon Pratt, Valuing a Business, Dow Jones 1981). 3. Examination of the Particular Company Organization -- finally, an actual examination of the specific organization's relationships, dynamics, and ability to cooperate is very significant. Shareholders who are not getting along tend to have their minority shares traded at higher discounts than a group of harmonious shareholders. Related to this issue is the restrictions placed by the current shareholders on who can or cannot buy shares. The more restrictive an enterprise is (i.e. restrictive buy/sell agreements) the greater the lack of marketability tends to be. In some instances, extremely restrictive shareholder agreements have resulted in 100 percent discounts due to the fact that the minority shares effectively could not be sold.
Torkelson *351 then examined Vaberg with respect to the three salient factors affecting marketability of the estate's shares: 1. Extent of Minority Interest -- the subject company is comprised of three primary shareholders owning 94.9 percent of the total outstanding stock. Therefore, the discount for lack of marketability would tend to be lower than a minority interest with a small ownership position, or in an enterprise with one controlling interest shareholder. 2. Quality and Risk Factors of the Real Estate or Equity -- additionally, the subject properties are fairly typical smaller apartment complexes and commercial properties with greater salability than much larger commercial properties would have in the publicly traded holding companies, thus reducing risk. The fact that the assets of the corporation are cash, land and building, with no intangible assets, also reduces the risk of the investment. In fact, during this time period real estate in the Grand Forks, North Dakota area was in very high demand due to the cities rapid growth and region wide draw of customers for retail and business from the northwest Minnesota area. In particular the residential apartment properties *352 owned by Vaberg Properties, Inc. had very low vacancies with some properties at 0 percent. With this in mind, we find that the assets of this holding company are of a lower risk when compared to other alternative types of business in the marketplace, and are of good overall salability due to the sizes and types of the buildings. Therefore, our discount for lack of marketability by this factor would tend toward the low to mid ranges of discount. 3. Company Organization -- there are no apparent restrictions placed on the sale of these shares, and the appreciation of real estate value over the past five years have made real estate holding companies quite valuable as real estate values tend to exceed the rates of inflation throughout the period particularly in growth areas such as Grand Forks, North Dakota. We would therefore place the discount for lack of marketability at the low to mid-range point.
Based upon his analysis of these salient factors, Torkelson finds the appropriate discount for lack of marketability to be 10 percent. In addition to this analysis, Torkelson relies on a study which was conducted of minority interests and privately held real estate titled *353 "Market Discounts for Undivided Minority in Real Estate," Peter J. Patchin, Real Estate Issues, Vol. 13, No. 2, Winter 1988. The study was based on 54 minority interest sales, 29 of which were apartment buildings in Minnesota. Among the 29 Minnesota apartment building minority interest sales, the size of the minority interest ranged from 1.5 to 18 percent with a median minority interest of 10 percent, and the sales dates ranged from 1980 to 1986. The median overall discount was 39.7 percent, which included minority interest and lack of marketability together. Torkelson found that the subject minority interest of 26.92 percent exceeds the median 10 percent minority interest in the study, and therefore would tend to have a lower discount rate. Also, with the existence of only three major shareholders, petitioner is able to exercise considerable influence on the business. Therefore, Torkelson finds, a total discount rate of 30 percent for minority interest and lack of marketability is appropriate. Torkelson includes a bibliography of eight sources on which he relied, in part, in arriving at the discounts. These sources range in publication dates from 1980 to 1988. Among the *354 eight sources are: Desmond, Glenn M. and Richard E. Kelley, Business Valuation Hand Book, Valuation Press, Inc., Los Angeles, CA, 1980 Pratt, Shannon, Valuing a Business, Dow Jones-Irwin, 1981 Gampel, Peter, Recent Thoughts when Valuing a Minority Interest in a Closely Held Company, Business Valuation Review, June 1987 Patchin, Peter J., Market Discounts for Undivided Minority Interest in Real Estate, Real Estate Issues, Vol. 13, No. 2, Fall/Winter 1988, American Society of Real Estate Counselors of the National Association of Realtors.
Torkelson includes the article by Peter Gampel as an attachment to the appraisal. IV. Conclusions
As a preliminary matter, we note that we find the parties' testimony, documentary evidence, and expert reports regarding general economic and market conditions largely irrelevant to the issue of the appropriate discounts for minority interest and lack of marketability. Petitioner and its expert witnesses argue that, at the date of death, the market for real estate of the type held by Vaberg, and general economic conditions in Grand Forks, North Dakota, were very weak with little or no growth. Respondent and his expert witness, *355 conversely, argue that a strong market existed for commercial real estate of the type held by Vaberg. Due to Professor Ramsett's extensive, detailed, and authoritative report, we agree with petitioner that, at the date of death, there was little or no growth in the market for properties of the type held by Vaberg. However, though such evidence is not completely irrelevant to the discount for marketability, we attach little weight to it because these factors were taken into account by Reilly in appraising the value of the underlying assets of Vaberg. The values arrived at by Reilly were the basis for the date of death values of the corporate properties. The parties agree that such values are accurate assessments of the fair market value of Vaberg's corporate assets as of June 6, 1985. The parties also agree that the fair market value of 100 percent of the Vaberg stock is equal to the fair market value of the corporate assets. Because in appraising the properties Reilly took into account the market for such property, as well as general economic conditions in Grand Forks, the fair market value of Vaberg's corporate assets, and therefore the fair market value of 100 percent of the *356 Vaberg stock, has already been adjusted for such conditions. To the extent that the market for residential real estate and general economic conditions would have a negative impact on the fair market value of the 26.92 percent of Vaberg stock held by the decedent, petitioner has already reduced the reported value of the stock on account of such impact. For this Court to adjust the discounts for minority interest and lack of marketability for these factors would be to duplicate the reduction in reported value due to such factors. A. Analysis Of Appraisals Of Minority Interest Discount
1. Petitioner's Appraisals
a. Appraisal By Whalen
We find the appraisal by Whalen, who is not a certified appraiser, unpersuasive for two reasons. First, he relies on Estate of Andrews v. Commissioner, supra, which does not support petitioner's position. The only other support for Whalen's appraisal is two articles by H. Calvin Coolidge. The studies are based on 100 unidentified transactions. Whalen does not discuss the size of the minority interest involved, the equity structures of the corporations, the types of properties, or any other relevant *357 circumstances, such as restrictive agreements. In addition, the studies cover a very broad period of time (1961-83). b. Appraisal By Cobb
We attach no weight to Cobb's appraisal. His sole source of support is an unidentified study dealing with publicly announced formal transfers of ownership of a company's assets or equities. There was no such transfer of Vaberg's assets or equities as of the date of valuation. Cobb provides no analysis of the appropriate discount for minority interest with respect to the decedent's interest in Vaberg. 2. Respondent's Appraisal
Torkelson analyzes the decedent's minority interest in Vaberg in comparison to Real Estate Investment Trusts (REIT's), the publicly traded stock most similar to a privately held real estate holding company. Torkelson bases his analysis on a very specific, comparable study published in 1986 which focuses on net asset values of REIT's. He then adjusts the findings of the study for the relevant factors of the decedent's stock in Vaberg. Torkelson also relies on a study based on sales of minority interests in apartment buildings. Again, he adjusts the findings of the article for the specific factors of decedent's *358 interest in Vaberg. Torkelson's analysis is persuasive because he relies on very specific studies of comparable properties, and then adjusts the minority interest discount for the relevant factors of decedent's interest. Petitioner's appraisals, on the other hand, are exceedingly general and lacking in specific analysis of the subject interest. We conclude that respondent has established that the appropriate discount for minority interest in the instant case is 20 percent, and we therefore sustain his determination. B. Analysis Of Appraisals Of Discount For Lack Of Marketability
1. Petitioner's Appraisals
a. Appraisal By Whalen
Once again, Whalen mistakenly relies on Estate of Andrews v. Commissioner, supra. In addition, he relies on studies of restricted stock published between 1966 and 1982. However, the instant case does not involve restricted stock, which would necessarily result in a higher discount for lack of marketability because of legal constraints on the sale of the stock interest. Whalen offers no analysis of the relevant factors of the specific stock interest at issue. At trial, Whalen offered an alternate method *359 of valuation involving the rate of return offered by Government bonds. Whalen fails to explain the relevance of such rate of return in evaluating the stock interest at issue. This method is inappropriate, and Whalen's appraisal of discount for lack of marketability is unconvincing and insufficient to meet petitioner's burden of proof. b. Appraisal By Cobb
Cobb offers a cogent analysis of why a discount for lack of marketability is appropriate in the instant case. However, respondent agrees that such a discount is appropriate; the issue is the amount of the discount. Cobb offers no analysis of the appropriate amount of the discount, and we therefore regard his appraisal as irrelevant. 2. Respondent's Appraisal
Torkelson begins his analysis with a comparison of restricted versus unrestricted blocks of stock. We find this aspect of his appraisal unpersuasive. However, Torkelson then examines specific factors which determine the amount of a discount for lack of marketability, and applies these factors to the instant case. Because of his analysis of specific factors related to the value of the decedent's interest in Vaberg, Torkelson's methodology is convincing *360 and superior to that of petitioner's expert witnesses. In addition, due to the greater experience, education, and professionalism in appraising business interests by Torkelson, Herber, and Strachota, we place greater weight on respondent's appraisal. Due to petitioner's failure to offer evidence showing that a greater discount for lack of marketability is warranted, and due to the convincing analysis offered by respondent in support of his determination, we sustain respondent's determination that the appropriate discount for lack of marketability is 10 percent. Addition To Tax Pursuant To Section 6660
Section 6660(a), which was repealed for returns due after December 31, 1989, provided that in the case of any underpayment of a tax imposed by subtitle B (relating to estate and gift taxes) which is attributable to a valuation understatement, there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributed. If the valuation claimed is 50 percent or more, but not more than 66-2/3 percent, of the correct valuation, the applicable percentage is 10 percent. Sec. 6660(b). There is a valuation understatement if the value of any property *361 claimed on any return is 66-2/3 percent or less of the amount determined to be the correct amount of such valuation. Sec. 6660(c). The section does not apply if the underpayment is less than $ 1,000 of the tax imposed with respect to the estate of the decedent. Sec. 6660(d). The Secretary may waive all or any part of the addition to tax provided by section 6660 on a showing by the taxpayer that there was a reasonable basis for the valuation claimed on the return and that such claim was made in good faith. Sec. 6660(e). In the instant case there is an underpayment of estate tax attributable to a valuation understatement, and the underpayment is at least $ 1,000 of the estate tax imposed with respect to the estate of the decedent. The value of the decedent's stock in Vaberg claimed by petitioner on its estate tax return is 53 percent of the correct valuation. Thus, the valuation claimed is 50 percent or more, but not more than 66-2/3 percent of the correct valuation. The applicable percentage is therefore 10 percent of the underpayment. Petitioner argues that it has shown it had a reasonable basis for the valuation claimed on its estate tax return and that the valuation was *362 made in good faith. Therefore, petitioner argues, respondent must waive the addition to tax. Respondent determined that petitioner did not have a reasonable basis for the valuation claimed on the return and that the valuation claimed on the return was not made in good faith, and therefore has not waived the addition to tax. Respondent's refusal to grant a waiver of the section 6660 addition to tax is subject to judicial review, and our review is whether respondent has abused his discretion. See Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988). Petitioner has the burden of proving that respondent abused his discretion. Rule 142(a); Mailman v. Commissioner, supra.
Petitioner's reporting of the decedent's Vaberg stock was vague, cursory, and inadequate, particularly given that petitioner was granted an additional 3 months to accurately determine the value of the shares. In preparing its estate tax return, petitioner did not commission an appraisal of the fair market value of the Vaberg stock, relying entirely on Estate of Andrews v. Commissioner, supra, an opinion which provides no support for petitioner's *363 valuation. An unexplained reference to a single opinion of this Court, decided on distinguishable and specific factual circumstances, is not a reasonable basis for reporting the value of an interest in a closely held corporation. Petitioner's reporting of the value of decedent's interest in Vaberg demonstrates a lack of effort to reasonably determine the appropriate discounts. In addition, the expert reports submitted by petitioner were lacking in substance and analysis. The authors of the reports were not professional appraisers, had no formal education in the valuation of business enterprises, and were not members of any professional associations involved in the education and certification of appraisers. Petitioner has failed to carry its burden of showing that respondent abused his discretion in determining that petitioner failed to show a reasonable basis existed for the valuation on petitioner's 1986 estate tax return or that the claim was made in good faith. We therefore sustain respondent's determination with respect to the addition to tax pursuant to section 6660. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect as of the date of the decedent's death. All Rule references are to the Tax Court Rules of Practice and Procedure.↩